**CRUSE et al. v. REINHARD et al.**

**REINHARD et al. v. CRUSE et al.**

**No. 4451.**

Court of Civil Appeals of Texas. Beaumont.

Jan. 6, 1948.

Rehearing Denied Feb. 19, 1948.

Strong, Moore & Nelson of Beaumont, for Reinhard and others.

George A. Weller, Marcus & Weller, and W. M. Crook, all of Beaumont, for Cruse and others.

WALKER, Justice.

Two appeals are before us from the judgment rendered in this suit by the District Court of Jefferson County.

The suit was brought to construe the will of Mrs. Mattie F. Cruse and to procure other relief. By dismissal, pursuant to an agreement of the parties, issues other than those made on the construction of the will were dropped from the case; and the subject matter of the appeals before us is limited to a construction of the will of Mrs. Cruse.

Mrs. Cruse, a widow at the time of her death, was survived by four children, whom she constituted independent executors of her estate, and by two grandchildren. All of these persons were parties to the suit, as were Buckner's Orphans Home and certain formal parties, the spouses of two of Mrs. Cruse's daughters and of her granddaugh-

ter. Plaintiffs were two of Mrs. Cruse's children, namely, Silas Hubert Cruse and Bertha Cruse Gardner (joined by her husband), suing as individuals and in their representative capacity. Defendants were: (1) Mrs. Cruse's other children, namely, Mrs. Ada Lee Cruse Reinhard, a widow, and Ethel Cruse Mouton (joined by her husband), individually and as executrices. of their mother's will; (2) Mrs. Cruse's grandchildren, namely, Jack Mouton, Jr., the son of Mrs. Mouton, and Martha Reinhard Gale (and husband), a daughter of Mrs. Reinhard; and (3) Buckner's Orphans Home.

All defendants answered. The cause was tried to the court, sitting without a jury; and the trial court rendered a judgment construing the will of Mrs. Cruse, and as an incident of that construction, ordered that Mrs. Cruse's estate be partitioned. The trial judge also filed an opinion, amplifying his views. All parties other than Buckner's Orphans Home have appealed. The conclusions of the trial court are stated in detail below, throughout our discussion of the questions made between the parties.

Mrs. Cruse died on December 12, 1941, leaving a will expressed in two documents, namely, an original will dated February 1, 1928, from which she struck certain bequests on November 27, 1937 (by cancellation), and a codicil to said will, dated "Feb. ——, 1940." Both the original will and the codicil were written in Mrs. Cruse's own hand. These documents were probated by the County Court of Jefferson County as Mrs. Cruse's will on January 13, 1942, the application to probate being made by all four of her children as her executors; and subsequent to the order of probate each of said executors duly qualified.

Mrs. Cruse's original will, omitting formal parts, read as follows: "I, Mattie F. Cruse, of the County of Jefferson, State of Texas, being of sound and disposing mind and memory and being desirous to settle my worldly affairs and directing how my estate shall be disposed of after my decease, do make and publish this, my last will and testament, hereby revoking all other wills heretofore made.

"First: I desire and direct that my body be buried in a christian like manner suitable to my circumstances and conditions in life

and that no unnecessary amount be expended in such burial.

"Second: I desire and direct that all of my just debts be paid out of my estate by my executors to be hereinafter appointed.

"Third: I desire and direct that then thousand ($10,000.00) Dollars in cash be invested in safe securities or deposited in a responsible bank, at interest, or bonds and stocks already held by me to that amount be set aside so that the income will be the equivalent to eight per cent (8%). This amount to be used by my daughter, Mrs. Ada Lee Cruse Reinhard as she thinks best, for the education of my grand daughter, Martha Reinhard, for a period of five years. This amount to remain invested and the income to be used by my daughter, Mrs. Ethel Cruse Mouton, for the education of my grand son, Jack Mouton, Jr., for a period of five years. Then the principal to be divided equally between my four children; Ada Lee Cruse Reinhard, Ethel Cruse Mouton, Bertha Cruse Gardner, and Silas Hubert Cruse. The above privilege to be granted to any other grand-child or children who may come before the principal is divided.

"Fourth: All the rest and residue of my estate, both real and personal, which I may die seized and possessed of or to which I may be entitled to at the time of my death, I give and bequeath to my four children, namely: Ada Lee Cruse Reinhard, Ethel Cruse Mouton, Bertha Cruse Gardner and Silas Hubert Cruse, to be divided equally between them share and share alike. It is my will and wish that my estate be kept intact and the income divided between my four children until such a time as they shall agree that it is more profitable to divide same.

"Fifth: I hereby constitute and appoint my son Silas Hubert Cruse, and my daughters, Ada Lee Cruse Reinhard, Ethel Cruse Mouton, and Bertha Cruse Gardner, Executor and Executrix of this, my last will and testament and direct that no bond or security be required of them.

"Sixth: It is my will that no other action shall be had in the County Courts in the administration of my estate, than to prove and record this will and to return an appraisement of my estate and a list of claims.

"Seventh: Should any one of my four children become dissatisfied, or attempt to break this will, then that one is to be paid One Thousand Dollars ($1,000.00) and relinquish all claims to their part of my estate."

On February 25, 1930, the three daughters, and on February 27th, 1930, the son, of Mrs. Cruse wrote their names at the foot of this document, signifying that they had read it and were familiar with it.

On November 27, 1937, when Mrs. Cruse's granddaughter was twenty-four years old and her grandson was twelve, Mrs. Cruse cancelled paragraph "Third" of the aforesaid will, and wrote across it in her own hand: "This paragraph null and void, No. 27, 1937. Mattie F. Cruse."

The codicil made in February, 1940, to the original will read as follows:

"One: I am adding this codicil to my will, since many things have changed, since it was written.

"I scratched paragraph No. Three, page two and wish to insert the following to take its place (insert for No. three):

"I will and direct, that my two grand children Martha Reinhard and Jack Mouton, Jr., share equal the income from my estate with my four children. This will divide the income between six.

"Two: It is my will and desire that my daughter Ethel keep the books and look after the business, since she has helped me for the past twenty years, and therefore fully understands the work.

"Three: It is my will and wish that my daughter Ethel continue to live in my home till and unless she wishes to change her residence, most of the furnishing belong to her. I have given nearly all my household goods to the other children, what is left I give to her.

"Four: Knowing the uncertainty of life, I direct in case that any one of my four children die without issue that their part of the estate revert back to my living children.

"In case that all the blood heirs are wiped out, I will, and direct that the residue of

my estate be turned over to Buckner's Orphans Home in Dallas, Texas, as a gift."

Mrs. Cruse's representatives returned an inventory and appraisement of her estate dated January 20, 1942, about a month and a half after her death, which lists assets of a total value of $53,263. This inventory is significant because it shows the character of Mrs. Cruse's investments and the geographical distribution of some of her properties.

The estate consisted of both real and personal property, the realty being valued at $31,020, about 60% of the estate, and the personalty, at $22,243, about 40% of the estate.

The realty includes lands located in three widely separated parts of Texas, namely, in Jefferson and Hardin Counties, which adjoin, and in El Paso County and in Dallas County. Almost all of this real estate is shown to be improved and presumably should be classed as investment for income. Five items, all improved and valued at $19,000, are listed in Jefferson County (City of Beaumont). Two items, both improved and valued at $10,330, were listed in Dallas County (City of Dallas). The lands in Hardin and El Paso Counties were shown to be improved, but the Hardin County lands were valued at only $290 and the El Paso County lands (city lots in El Paso) were valued at only $1400.

The personal property consisted of shares in seven different corporations, valued at $22,000, and of an automobile valued at $243. Of this $22,000 valuation, $15,300 represents valuation at $100 per share.

Thus, considering the value of the improved real estate ($29,330) and the $15,300 last mentioned, this inventory indicates that of a total estate of $53,263, at least $44,630, or approximately 84% was permanently invested in valuable properties.

The trial court admitted testimony by Defendant Ethel Mouton and Plaintiff Silas Cruse which tended to identify the "home" referred to in Codicil-3. The statements of these witnesses may not be consistent in all details, but the disagreement seems to be of no significance.

Without doubt, Mrs. Cruse's homestead consisted of three city lots forming one tract on the ground, namely, Lots 4, 5 & 6, in Block 17 (McFaddin 2nd Addition to the City of Beaumont). These lots were conveyed to Mrs. Cruse on March 4, 1902, and while she conveyed Lot 4 to Plaintiff Bertha Gardner on November 30, 1919, under some sort of a partition agreement, she purchased this lot and took a conveyance thereof from her daughter on June 7, 1930; and thereafter continued to own it until she died. She rendered all three lots to the Assessor-Collector of Jefferson County for taxation as her residential homestead during the years 1933 to 1941, inclusive; and the aforesaid inventory of her estate refers to this property as one item, identified as "2094 Calder, Block 17, McFaddin 2nd Addition to the City of Beaumont, Texas." The improvements, namely, a residence and a separate structure with garage stalls below and living quarters above, were on Lots 5 and 6. Lot 4 was vacant except for trees and shubbery; Mrs. Mouton said that it formed part of Mrs. Cruse's yard, and there is no evidence necessarily to the contrary nor any evidence that it was ever used for any other purpose. Silas Cruse's statement that no use was made of this lot 4 for many years may be reconciled with that of Mrs. Mouton—but if not, then the trial court has adopted Mrs. Mouton's view, under the finding to which we shall refer below. Mrs. Mouton's statement covers at least the period from 1937 or 1938 until her mother's death in December, 1941. Mrs. Mouton said that there were pecan trees on this lot (her brother disagreed) and that her mother gathered pecans from this lot a few days before she died.

It was not clearly shown when Mrs. Cruse took up her residence on this property, nor when the improvements were built; but Silas Cruse said that the residence had been converted into a "duplex" apartment about twenty-eight years before trial of this cause (in 1946). Defendant Ethel Mouton referred to occupancy of the residence by members of Mrs. Cruse's family during the last 15 years of her mother's life, and Silas Cruse said that his mother had occupied the downstairs apartment in the residence since 1932 or 1933. We infer from his testimony that she returned

to that apartment at that time after an extended stay with her mother.

The residence was of three stories, arranged so that the 1st and 2nd stories could be occupied as separate apartments. The third story was used as a storeroom.

The evidence respecting the use made of this residence before Mrs. Mouton came to live with her mother in 1937 or 1938 is indefinite. We have referred to Silas Cruse's statement that "the house was converted into a duplex, one apartment upstairs and one down, about 28 years ago"; he said that the "upstairs apartment has nearly always been rented." Mrs. Mouton's testimony shows that this residence had been occupied on occasion, during her mother's lifetime, by various members of the family other than Mrs. Cruse, without charge to them (as, indeed, Silas Cruse did not deny). She testified:

"Q. Mrs. Mouton, when your mother was living, what portion of the house did she occupy? A. We occupied the entire house on many occasions.

"Q. When you say 'We,' who lived there? A. Various members of the family, Mrs. Reinhard and her daughter lived there.

"Q. When did they live there? A. About fifteen years ago, and Mr. and Mrs. —my mother's brother, Mr. and Mrs. Hardee Turner and their son, Hardee Turner, Jr., my grandmother, Mrs. L. A. Turner, lived there, my aunt, Mrs. Ferguson lived there. I have lived there. Mr. and Mrs. Howard Gardner lived there twice, and we all lived there free of charge. It has been a home for everybody. * * *

"Q. What portion of the house was occupied by your mother then ten years ago? A. The whole house.

"Q. Was the house divided up into apartments at that time? A. No, it was not divided up into apartments. It has one upstairs divided. It is not apartments. It is rooms exactly as it was in her lifetime.

"Q. Did your mother rent out the upstairs when she lived there? A. She did when her family did not occupy it. She did that to pay her taxes and up-keep because she wasn't a rich woman."

Mrs. Mouton came to care for her mother in 1937 or 1938, and has resided in this dwelling since that time. While she was there her mother's living quarters were on the first floor (as Silas Cruse said they had been since 1932 or 1933), but Mrs. Cruse had property stored on the 3rd floor and had items of property (presumably furniture) on the second floor. Mrs. Mouton, while her mother was alive, resided on the 2nd floor when it was not rented, but it usually was rented, and it was occupied by Mrs. Cruse's tenants during the two years preceding her death. Since her mother died, Mrs. Mouton has continued to reside on the first floor, and the second floor has been rented to tenants. No member of the family other than Mrs. Mouton and her son seems to have resided in this dwelling for any length of time since Mrs. Mouton came to live with Mrs. Cruse, except Mrs. Ferguson, Mrs. Cruse's sister, whose visits covered several months. It is to be inferred that Mrs. Ferguson and such other members of the family as may have visited Mrs. Cruse stayed in Mrs. Cruse's rooms, which were ample, there being eight rooms on the first floor.

There is no evidence that the quarters above the garage stalls were ever occupied by Mrs. Cruse or any member of her family. Silas Cruse testified that these were once servant's quarters but had been converted "in recent years" into rental apartments. According to Mrs. Mouton, these quarters consisted of two rooms, and Mr. Cruse seems to agree, although he apparently refers to each room as an apartment. These garage quarters were continuously rented from some indefinite period beginning prior to Mrs. Cruse's death down to the time of trial, except when in a damaged condition as a result of a fire which occurred.

The rentals of the garage quarters and the 2nd story of the residence have been paid in to the treasury of the estate. Mrs. Mouton testified that this was done pursuant to "mutual agreement," the estate being obligated to "keep the property up" and the profit being divided as was the other income from the estate.

The only other evidence to which we need refer in this preliminary statement is

that respecting the ages of Mrs. Cruse's children and grandchildren—as of September 27, 1946. On that date, Silas Cruse was 51 years old, married but without children (it is recited in his brief that his child died). Bertha Cruse Gardner, the wife of Howard Gardner, was 55 years old, without children. Ethel Cruse Mouton, wife of Jack C. Mouton, was 57 years old, with one son, Jack Mouton, Jr., who was 21. Ada Lee Cruse Reinhard, a widow, was 60 years old, with one daughter, Martha, aged 33, married to A. F. Gale.

Thus when Mrs. Cruse wrote her original will, dated February 1, 1928, Silas was 33 years old, Bertha was 37, Ethel was 39 and her son was 3, Ada was 42 and her daughter was 15.

When Mrs. Cruse cancelled Will-3 on November 27, 1937, some nine years later, Silas was 42 years old, Bertha was 46, Ethel was 48 and her son was 12, Ada was 51 and her daughter was 24.

When Mrs. Cruse wrote the codicil in February, 1940, 12 years subsequent to the date of her will, Silas was 45 years old, Bertha was 49, Ethel was 51 and her son was 15, Ada was 54 and her daughter was 27.

It therefore seems probable that at the time the codicil was written, Silas and Bertha would have no children while Ethel and Ada would each leave one child, and that Mrs. Cruse knew this.

The estate has not yet been partitioned.

We proceed to discuss the issues made on this appeal. It will not be necessary to refer to the Points of Error in detail, and we shall dispose of the issues by discussing the questions raised.

■ The problem, of course, in construing Mrs. Cruse's will is to determine the intent of the testatrix. Both the will and the codicil are in testatrix's own handwriting. The phraseology of the original will suggests that testatrix copied, or used as a model, some document written by a lawyer; but the codicil is patently the work of an inexperienced draftsman, not learned in the law, and we take it to be the composition of Mrs. Cruse alone. Therefore in construing the codicil, we shall be justified in giving to the testatrix's words a literal application and the meaning which an intelligent, adult layman, of some education and experience in life, might be expected to attach to such language, and in avoiding implications which might occur only to a lawyer. See: Gilkery v. Chambers, Tex.Sup., 207 S.W.2d 70. Further, we must give effect to the codicil where it conflicts with the original will; but having done this, we must, if possible, then give effect and meaning to every part of the codicil and every remaining part of the original will.

(I) The first question to be noticed involves Codicil-Two, reading: "It is my will and desire that my daughter Ethel keep the books and look after the business, since she has helped me for the past twenty years, and therefore fully understands the work".

■ According to the parties, this question is simply whether Codicil-Two is precatory or mandatory. Plaintiffs say that it is precatory, and the trial court so held. Defendants say that it is mandatory, and that Defendant Ethel Mouton must be employed by the Estate to perform the duties referred to in Codicil-Two and must be paid a reasonable compensation for her services.

We hold that Codicil-Two must be construed to be precatory. The words "will and desire" may seem mandatory in form, but Codicil-Two does not provide any compensation for Ethel's work. If complied with, it would provide the Estate with an experienced office manager who was familiar with the estate properties and with testatrix's system of management, and the effect of such a compliance would presumably prove to be a more remunerative handling of the Estate, to the profit of all of the beneficiaries. Codicil-Two is directed as much to Defendant Ethel Mouton as to the other beneficiaries; and since Mrs. Mouton was an object of testatrix's bounty, who received something more than did any other devisee, namely, a home during the remainder of her life if she chose to accept the provision made for her in Codicil-Three, and since Codicil-Two does not refer to any compensation for Mrs. Mouton, we think Codicil-Two was primarily intend-

ed to make Mrs. Mouton's services available to the Estate. Testatrix's primary object seems to be the charging of a duty upon her daughter, for the benefit of testatrix's estate and of all her beneficiaries.

However, no penalty is attached to Mrs. Mouton's refusal to perform the duties referred to in Codicil-Two, nor any to the refusal of Mrs. Mouton's fellow beneficiaries to use her services, and testatrix's purpose being to assist the managers of her estate and not to interfere with them, Codicil-Two must therefore be held to be precatory in effect, although it might seem mandatory in form. Our conclusion is in accord with judgments rendered elsewhere. 37 L.R.A.,N.S., 685; 49 A.L.R. 100, p. 102; Cooke v. King, 154 Or. 621, 61 P.2d 429, 62 P.2d 20, 107 A.L.R. 896, p. 924.

■ Our construction of Codicil-Two suggests that Defendant Ethel Mouton was intended to be the managing trustee of the trust estate to which we refer below. However, such a purpose is not clearly expressed, and other provisions of the original will and the codicil show that Mrs. Mouton was only expected to perform subordinate duties. She was only one of four executors and only one of four to whom the title to the corpus of the estate was devised and bequeathed. She was only one of four to whom testatrix gave the power of partition. She could not have been managing trustee while the executors were performing their statutory duties, and in the absence of some clear provision therefor, such an office as managing trustee seems inconsistent with the other provisions referred to. The character of Mrs. Cruse's investments and the geographical distribution of her real property doubtless suggested to Mrs. Cruse the necessity of some estate office and staff, and she evidently looked to Mrs. Mouton to perform this function, all matters of discretion being vested in her four children as executors/trustees.

(II) The next group of questions involves Codicil-Three, which reads: "It is my will and wish that my daughter Ethel continue to live in my home till and unless she wishes to change her residence. Most of the furnishing belong to her. I have given nearly all my household goods to the other children, what is left I give to her."

The trial court found that the "home" consisted of Lots 4, 5 and 6, in Block 17, etc., with all improvements located thereon. The trial court then vested Defendant Ethel Mouton with an interest in this property which seems to have all of the incidents of a life estate, upon conditional limitation (automatic termination upon Mrs. Mouton's abandonment of the property) except the power of alienation—which was necessarily denied her by the limitation upon her interest. Mrs. Mouton was adjudged to be entitled to receive all rents and revenues from the property and was charged with liability for repairs, taxes and insurance. The trial court held further that the interest in testatrix's "home" which was devised to Mrs. Mouton was an additional gift to her, over and above what was given the other beneficiaries, that the "home" was to be excepted from any partition of testatrix's estate while Mrs. Mouton's right therein existed, and that she was not to be charged with the value of this right upon a partition of the estate.

We know of no legal estate intervening between a right of occupancy and a life estate, and Codicil-Three therefore granted Mrs. Mouton either one or the other.

■ (A) We hold upon the following grounds that Codicil-Three vested Defendant Ethel Mouton with only a right of occupancy, not with a life estate: (1) Such is the result of a literal application of testatrix's language—consistently with our belief that the codicil was written by one not learned in the law. It was the right to *live* in the "home," not the "home" itself, which was devised. (2) The limitation upon Mrs. Mouton's interest—automatic termination upon Mrs. Mouton's abandonment of the property, for which Codicil-Three clearly provides—prevents alienation of this interest. Lack of power to alienate is consistent with and indicates a mere right of occupancy, but is inconsistent with a life estate, which may ordinarily be conveyed. Indeed a general restriction upon the alienation of a legal life estate is held to be void. Seay v. Cockrell, 102 Tex. 280,

115 S.W. 1160; Sprinkle v. Leslie, 36 Tex. Civ.App. 356, 81 S.W. 1018. We need not consider the validity of the limitation upon Mrs. Mouton's interest if that limitation were applied to a legal life estate. This limitation clearly shows that testatrix only wanted to give her daughter a home, not property usable for other purposes; and such an object indicates a right of occupancy only. (3) Testatrix's terms are very general. Testatrix, in terms, has given Mrs. Mouton a right limited to her in ownership, to occupy an indefinite space for an indefinite time (as long as she wishes). Such generality accords with a mere right of occupancy. (4) A life estate, even one terminable upon condition, implies income and liability as well, as the trial court held. Yet testatrix referred to neither income nor liability in Codicil-Three, and at least her failure to mention income is significant. She had made bequests of income before she wrote Codicil-Three, first in 1928 in Will-Third, and Will-Fourth, and next again in Codicil-One, which is the only bequest of income made in the codicil. The bequest in Codicil-One was general in terms, purportedly dividing all of the income from testatrix's entire estate among six persons, of whom Mrs. Mouton was one; and it would seem that if testatrix intended to except the rentals earned by her "home" from the general bequest made in Codicil-One, she would have expressly so provided in Codicil-Three. We conclude that Codicil-Three did not bequeath to Mrs. Mouton the rentals from testatrix's home. It necessarily follows that testatrix did not intend Mrs. Mouton's right of occupancy to be charged with liability for repairs, taxes, and insurance, for this would almost be the equivalent of charging Mrs. Mouton rent for her use of the "home," and would be a serious limitation upon testatrix's gift to her daughter.

On the whole, the object of Codicil-Three seems to be only the provision of a residence, a dwelling place where Mrs. Mouton might maintain her home, free of liability for maintenance, taxes, etc., and without the right to rents and revenues which might be earned by the property. Mrs. Mouton's right is a right of occupancy

and nothing more. See: Adams v. Henry, Tex.Civ.App., 231 S.W. 152; Lynn v. Busby, 46 Tex. 600; Busby v. Lynn, 37 Tex. 146.

■ (B) We are bound by, and indeed agree with, the trial court's fact finding that the "home" of testatrix, to which she referred in Codicil-Three, extended to all three lots, namely, Lots 4, 5, and 6, in Block 17, etc., and to all improvements located thereon. The evidence is set out in our preliminary statement.

■ (C) The very broad terms used by testatrix ("continue to live in my home") obviously vest Mrs. Mouton with some discretion to determine what part and how much of testatrix's home she shall occupy, and what incidental and related uses she shall make of the property. Her guiding standard is testatrix's purpose to provide her with a home; her right, consequently, is to determine, in reason and in good faith, where her living quarters shall be and how much of the improvements she shall occupy and use for a home.

Doubtless testatrix expected her to dwell in the residence, but Mrs. Mouton's right of occupancy is not fixed upon nor limited to the ground floor apartment which testatrix and Mrs. Mouton, herself, have so long occupied, nor to any other particular part of the home property. Testatrix gave to her daughter the right to "continue to live in my home," and since we know what the home is, we see nothing in Codicil-Three to prevent Mrs. Mouton occupying any part of the residence she may elect to use, or the living quarters above the garage, if she desires, or, indeed, both structures if her needs require. Nothing indicates that testatrix intended to restrict Mrs. Mouton's movements within the "home." Further, in determining her needs Mrs. Mouton may properly bear in mind that she has a family. Mrs. Mouton's mother could not have intended that her daughter have a home, yet no place in that home for the daughter's family to visit her, or abide with her. Mrs. Mouton's right to "live" in the home of testatrix includes the right to include within her use such space as her son and husband might require. Of course, if her son marries, the estate is not

to be burdened with providing a permanent residence for *his* family.

Necessarily incidental to Mrs. Mouton's occupancy are the various uses of the property which, in reason and good faith, are incidental and related to Mrs. Mouton's use of the property for her home, such as the planting of flowers and a garden, the use of a garage stall, any stall, to house her automobile, and the use of the attic as a storage place for her property.

(D) We need not at this time determine whether Mrs. Mouton may compel the Estate to maintain the home property in a habitable condition. However, she is not liable for, and need not pay, any charges for taxes, repairs or other maintenance, insurance, etc., and any rentals or other revenues which may be earned by the property must be paid into the Estate treasury— as long as that treasury exists. The estate treasury will cease to exist when the estate is partitioned, and liability for the charges just listed and the right to receive the income from the property will doubtless be affected by the terms of the partition.

■ (E) While the estate remains unpartitioned, the home property constitutes a part of the estate, subject only to Mrs. Mouton's right of occupancy, and the executors, trustees, in whom control of the estate is vested have the right to use or to rent such part of the property as Mrs. Mouton does not need. They must respect the priority of her right, however, and make such use of the property, or let the unused part of the property only to such persons, as might reasonably be expected not to materially interfere with Mrs. Mouton's use and enjoyment of the premises as her home.

■ (F) Mrs. Mouton's right of occupancy will not prevent a partition of testatrix's estate, including the home. However, the partition will be subject to her right of occupancy; testatrix's home will be impressed with Mrs. Mouton's right of occupancy if it is awarded, in whole or in part, to some one other than Mrs. Mouton. Hudgins v. Sansom, 72 Tex. 229, 10 S.W. 104.

Since Mrs. Mouton's right of occupancy is non-transferable—because it automatically terminates when Mrs. Mouton abandons the property—it should not be assigned any value in determining how the estate shall be partitioned. Russell v. Russell, Tex.Civ.App., 234 S.W. 935; Haley v. Hail, Tex.Civ.App., 135 S.W. 663.

■ (G) According to the plain terms of Codicil-three, Mrs. Mouton's right of occupancy endures throughout her natural life or, until she abandons the property and takes up residence elsewhere.

(III) The third group of questions involves the construction of Codicil-One, Codicil-Four and Will-Fourth.

The trial court held: (a) That the income bequest made to the two grandchildren in Codicil-One endured until the estate was partitioned; (b) that the closing sentence of Will-Fourth, directing a partition only when all four of testatrix's children agreed that it would be more profitable to do so, was precatory and that the estate must therefore be partitioned after a reasonable time; (c) that a reasonable time had elapsed and the estate should be partitioned (omitting from the partition the home of testatrix); (d) that Codicil-Four was only intended to apply if one or more of testatrix's children died before testatrix died and was not intended to have any effect if all four of testatrix's children survived her; (e) and that under Will-Fourth, fee simple title to testatrix's estate vested in Testatrix's four children at the time of her death. These holdings and the arguments of the parties have raised the matters now to be discussed.

(A) We shall refer to Codicil-Four, reading: "Knowing the uncertainty of life, I direct in case that any one of my four children die without issue that their part of the estate revert back to my living children. In case that all the blood heirs are wiped out, I will, and direct that the residue of my estate be turned over to Buckner's Orphans Home in Dallas, Texas, as a gift."

The trial court evidently believed that the words "uncertainty of life" in the first sentence of Codicil-Four referred only to the uncertainty of all of testatrix's children surviving her. Plaintiffs say that this construction is right, that when testatrix wrote the codicil the facts before her (to which we have referred in our preliminary state-

ment) showed it to be reasonably certain, and not uncertain, that Plaintiffs would have no children while Defendants Ethel Mouton and Ada Reinhard would leave children, and that the only uncertainty which testatrix could have had in mind must therefore have been the uncertainty of her children, one or more of them, surviving her. They argue that this is consistent with testatrix's dominant intent, which, from Will-Fourth, they declare to be equality among testatrix's four children and say that if Codicil-Four is made operative after testatrix's death, the result will be a preference of Defendants Ethel and Ada, through their children, above Plaintiffs Silas and Bertha, who have no children.

(1) We do not agree with the trial court's construction, nor with Plaintiffs' argument. We find no such dominant intent in testatrix's will as Plaintiffs see expressed there. If equality had been testatrix's dominant intent, she need not have written her codicil. We think that testatrix had in mind another and a much broader uncertainty than Plaintiffs suggest; and if a possibility of inheritance by the children of Ethel and Ada could ever be regarded as a preference of Ethel and Ada above Silas and Bertha, that possibility does not amount to a preference under our construction of testatrix's will.

■■■ We hold that Codicil-Four was intended to operate after testatrix's death as well as before, and that it constituted a limitation upon the devises and bequests made to testatrix's children, our grounds being as follows: (a) The language of Codicil-Four does not specifically refer to, and thus limit the operation of Codicil-Four to the case of a child or children of testatrix dying before testatrix's death, although such a restriction could very easily have been written into Codicil-Four had testatrix desired. This restriction upon Codicil-Four must be read into Codicil-Four under a process of construction. However, if we extend the operation of Codicil-Four beyond testatrix's death, we shall only make the literal application of testatrix's language which we are inclined to give the words of the layman who writes his own

will. (b) Another *uncertainty* than that of a child or children surviving her could have occurred to testatrix, one which accords more with the recognition that *all* in life is uncertain which testatrix expressed in the words: "Knowing that uncertainty of *life.*" We refer to the possibility that not only testatrix, but also her daughters Ethel and Ada might not leave children surviving them. (c) Testatrix made all four children executors and vested in the four the power of determining when her estate should be partitioned. Such provisions indicate a belief that the four probably would survive testatrix. (d) The trial court's construction seems to postulate an object which the construction, itself, will not accomplish. What reason could testatrix have had for providing against the death of one or more of her children before her own death? The first possibility is that she wished to avoid intestacy. It might be argued with some force that under Will-Fourth, the death of one of testatrix's children before the death of testatrix would cause the bequest to that child to lapse, except as that child's share might descend and pass under Art. 8295, R.S.1925. See Hagood v. Hagood, Tex.Civ. App., 186 S.W. 220; Id., Tex.Civ.App., 187 S.W. 228. If the shares of Defendants Ethel and Ada lapsed, then under Art. 8295 (and see Bomar v. Carstairs, 124 Tex. 492, 79 S.W.2d 841), these shares would apparently pass to the children of said Defendants. If the shares of Plaintiffs Silas and Bertha lapsed, then Art. 2570, R.S.1925, instead of Art. 8295, would seem applicable, Plaintiffs having no children, and under Art. 2570, testatrix's immediate heirs would be her surviving children and grandchildren. These courses of descent are in perfect accord with the intent expressed in Codicil-Four—as far as they go. But Codicil-Four would perform no function if it was written with only these possibilities in mind. Therefore we must consider other possibilities and such possibilities occur. For instance, if Will-Fourth is a gift to a class, testatrix would not be intestate unless all four of her children died before she died; the surviving child would acquire the entire estate. This might deprive the grandchildren of an inheritance, and is therefore inconsistent with the intent expressed in

Codicil-Four. However, it is hard to believe that testatrix wrote Codicil-Four to avoid such a possibility, under such an interpretation of the will. There remains only one other function which can be assigned to Codicil-Four, namely, to fix testatrix's benefactions upon the natural objects of her bounty, her children and grandchildren, and to cut off inheritance by other persons. For there was a possibility of such inheritance, by the spouses of her children or grandchildren or by testatrix's collateral kindred. This, we think, was the function which testatrix expected Codicil-Four to perform. Testatrix wished to avoid the case of one of her children dying without children. Why; if not because she had this function in mind? Yet if this was the function which testatrix intended Codicil-Four to perform, her object would be defeated by the trial court's construction, which leaves in existence the rights of inheritance which were to be avoided. We have been impressed by the fact that there was a much greater possibility of inheritance by excluded persons only if title in full actually vested under testatrix's will. Our conclusions are in accord with authorities construing the provisions of wills expressed in single instruments. St. Paul's Sanitarium v. Freeman, 102 Tex. 376, 117 S.W. 425, 132 Am.St.Rep. 886; Darragh v. Barmore, Tex.Com.App., 242 S.W. 714, 715; Federal Land Bank of Houston v. Little, 130 Tex. 173, 107 S.W.2d 374.

■ (2) Our construction attaches a limitation to the devises and bequests made by testatrix and creates a class of contingent future interests. Defendants say that these contingent interests attach to the full shares of testatrix's children, while Plaintiffs say that these interests only attach to such parts of their respective shares as the children may not have disposed of at the time of their death. Under Plaintiff's argument, testatrix's children would have a full power of sale and consumption, their conveyances and assignments passing complete and perfect title to land and to personalty, while Defendants' argument denies them this power.

We agree with Plaintiffs here, basing our conclusion upon what we conceive to be testatrix's intention. Testatrix provided for a gift over of a child's *"part* of the estate". But what part? The part the child received at testatrix's death or the part which that child owned at the time of its death? Testatrix must have intended the latter alternative, not the first. She clearly provided that Buckner's Orphans Home would get only what might be left unexpended by her other devisees (as distinguished from the entire original estate) for to Buckner's she devised the *residue* of her estate, not her *full estate,* upon the destruction of her "blood heirs" and if Buckner's contingent interest extended only to the *residue,* so must have the other contingent interests. There is nothing in Codicil-Four to indicate that Buckner's possibility of inheritance was to be less in quantity than the others. Further, testatrix was not learned in the law and probably did not have in mind the technical implications which Defendants have drawn. We believe, on the contrary, that she probably expected her beneficiaries to deal freely with her estate after the estate was partitioned, and we have been influenced here by our construction of the provision in Will-Fourth, discussed below, governing the time for partitioning the testatrix's estate. We have construed that provision as prohibiting sale of an estate property until time comes to partition the estate, that time being the time when the entire estate ceases to return a due income on the values locked up within it (or one of the four children dies or becomes incapable of exercising the discretion reposed in him). Such a provision would be pointless unless the properties could be sold on or after partition, and therefore it implies a power of sale. Yet there would not be an effective power of sale if the limitation upon the interests of the testatrix's four children attaches to the full shares inherited, as distinguished from the residue of those shares which may remain at the death of said children. Such powers of disposition, sale and consumption as the testatrix's four children have under our conclusions are valid, and may be inferred from provisions indicating the grantor's or testator's intention. See: Lockridge v. McCommon, Tex.Sup., 38 S.W. 33; O'Neal v. Clymer, Tex.Civ.App., 61 S.W.

545; Cottrell v. Moreman, Tex.Civ.App., 136 S.W. 124; West v. Glisson, Tex.Civ. App., 184 S.W. 1042; Aron v. Aron, Tex. Civ.App., 168 S.W.2d 917; Pool v. Sneed, Tex.Civ.App., 173 S.W.2d 768; Littler v. Dielmann, 48 Tex.Civ.App. 392, 106 S.W. 1137. Finally, there is to be kept in mind the fact that some 40% of testatrix's estate is personalty, and we are disinclined to attach such a limitation as Defendants argue for unless the intention so to do is more clearly expressed. Darragh v. Barmore, Tex.Com.App., 242 S.W. 714, 715, at page 717(13).

 (3) The words "die without issue" in the first sentence of Codicil-Four testatrix means "die without issue *surviving*" and "issue" means children.

The condition expressed in Codicil-Four will not be discharged upon the *birth* of grandchildren; both Defendants Ethel and Ada had children alive when testatrix wrote both her original will and the codicil, and we think, as indicated above, that the *uncertainty of life* to which testatrix referred to in this sentence of Codicil-Four included the possibility that Ethel and Ada would survive their own children.

 (B) We may now refer to Codicil-One and Will-Fourth, reading as follows: "(Codicil-One) I am adding this codicil to my will, since many things have changed, since it was written. I scratched paragraph No. Three, page two and wish to insert the following to take its place: (insert for No. three) I will and direct, that my two grandchildren Martha Reinhard and Jack Mouton, Jr., share equal the income from my estate with my four children. This will divide the income between six. (Will-Fourth) All the rest and residue of my estate, both real and personal, which I may die seized and possessed of or to which I may be entitled to at the time of my death, I give and bequeath to my four children, namely, Ada Lee Cruse Reinhard, Ethel Cruse Mouton, Bertha Cruse Gardner and Silas Hubert Cruse, to be divided equally between them share and share alike. It is my will and wish that my estate be kept intact and the income be divided between my four children until such time as they shall agree that it is more profitable to divide same."

Defendants argue that a trust was created by these provisions, and we agree. The corpus of the trust consists of Mrs. Cruse's entire estate, subject to Mrs. Mouton's right to dwell in testatrix's home. The trustees are testatrix's four children; we need not determine whether the office of trustee vested in them under their appointment as executors or under the devise to them of the title to the estate, made in Will-Fourth, since in either event the same persons are trustees. The beneficiaries are the six persons referred to in Codicil-One, namely, testatrix's two grandchildren and her four children, and the object of the trust is to provide an income for these beneficiaries. The trust expires when the estate is partitioned.

(1) We hold that a trust exists for these reasons: (a) A bequest of income was made to the grandchildren in Codicil-One, yet these grandchildren were given no control over the estate and no interest in the title to the estate. Control and title were vested in the testatrix's children, who, being necessarily charged with the duty of paying this income bequest to the grandchildren, must necessarily be trustees for said grandchildren. (b) This bequest of income to the grandchildren would otherwise be illusory. If it constitutes the subject-matter of a trust, it runs for an ascertainable time and we give it effect and meaning; but if it is not the subject-matter of a trust, no period of time is fixed by the will for the duration of this bequest, and since the administration of testatrix's estate was made independent, the bequest would depend upon the wishes of testatrix's four children. It is to be kept in mind that this bequest to the grandchildren reduces the income which Plaintiffs would otherwise receive, and only such desire as Plaintiffs might have to make a gift to niece and nephew would prevent Plaintiffs' self interest from causing a partition of the estate and thus cutting off the grandchildren's bequest as soon as possible. Testatrix did not intend her bequest to her grandchildren to be so uncertain. She brought this bequest into the

codicil after she had cancelled bequests made to these grandchildren in her original will and Codicil-One places grandchildren and children in one single class, placing them on an equal basis while it endures. (c) A comparison of Codicil-One with Will-Fourth shows that testatrix has divided the usufruct of her estate from the title to the estate and vested ownership of the usufruct for a time in a group different from the group to whom she devised the title. The income is referred to in Codicil-One, and there bequeathed as a single item of property to six persons, in equal shares, while the title is devised to only four of these six. Such a separation, and the possible objects accomplished thereby during the time provided in the will (until partition) imply duties which in turn imply a trust. (Partition time, provided in Will-Fourth, has no necessary connection with the statutory administration of testatrix's estate. It might well not occur until long after the administration closed, and testatrix has thus provided for the management of her estate as a unit after the expiration of the administration of her estate). This division of usufruct and title during the period referred to accomplished two objects, each constituting a separate benefaction. One object was the benefaction of the grandchildren through the bequest of income in Codicil One, to which reference has been made. Another object, to us an apparent one, is the benefaction of testatrix's children by increasing the security of their return from the estate during the time before partition. For while the estate is undivided, there is more likelihood of the whole producing an income than of the segregated parts doing so. The broader coverage of the investment before partition forms some security for the return of some income to the various beneficiaries.

To effectuate an intention, trusts are often declared as a matter of inference from powers granted and duties imposed, and from manifest purposes which cannot be accomplished except through such an instrument as a trust. 69 C.J. 740, 741 (Notes 73, 74) (Sec. 1849). For applications of this principle, see: Estes v. Estes, Tex. Com.App., 267 S.W. 709; Brooker v. Brook-

er, 130 Tex. 27, 106 S.W.2d 247, at page 253: "In spite of this, by the use of the term 'trustees' and the necessary implication arising from the authority attempted to be conferred, and the duties attempted to be imposed, we are compelled to the conclusion that the testator intended that the legal title to the trust estate should vest immediately upon the death in the trustees appointed to control and manage it"; McMullen v. Sims, Tex.Com.App., 37 S.W.2d 141; Dulin v. Moore, 96 Tex. 135, 70 S.W. 742; McMurray v. Stanley, 69 Tex. 227, 6 S.W. 412; Adams v. Williams, 112 Tex. 469, 248 S.W. 673; Patten v. Herring, 9 Tex.Civ.App. 640, 29 S.W. 388; Appel v. Childress, 53 Tex.Civ.App. 607, 116 S.W. 129, at page 132; Lane v. Miller-Vidor Lbr. Co., Tex.Civ.App., 176 S.W. 100, at page 103; Hunt v. Dallas Trust & Savings Bank, Tex.Civ.App., 237 S.W. 605; McHatton's Estate v. Peale's Estate, Tex.Civ.App., 248 S.W. 103; Paton v. Baugh, Tex.Civ.App., 265 S.W. 250.

(2) We fix the expiration of this trust at the time the estate is partitioned, for these reasons: (a) Codicil-One must be read with Will-Fourth. Doing this shows that the final sentence of Will-Fourth contains (at least in terms) a bequest of income to testatrix's four children, and this income is the income from the unpartitioned estate. Codicil-One provides, however, that the grandchildren shall "share equal the *income* from my *estate* with my four children. This will divide the income between six." Codicil-One evidently amends the final sentence of Will-Fourth by adding the grandchildren to the bequest, and the *income* from the *estate* which is bequeathed in Codicil-One to six people is evidently the same income from the same estate which Will-Fourth bequeathed to only four of these six. Since the estate will cease to exist upon being partitioned, the time of partition will cut off the income from that estate which was bequeathed in Codicil-One; and it is this bequest of income which forms the subject-matter of the administration of the trust. (b) We give effect and meaning to the final sentence of Will-Fourth (providing when partition shall be made), and we see no evidence that testatrix expected her bequest of

income to expire at any other time than the time provided in Will-Fourth. Actually, no other possible time is fixed in the instrument; and the effect we give the final sentence of Will-Fourth would be anomalous if we also hold it to be independent of Codicil-One.

▪ (3) The time for partition is fixed by the final sentence of Will-Fourth, reading: "It is my will and wish that my estate be kept intact and the income be divided between my four children until such a time as they agree that it is more profitable to divide same." While this language is confusing, it is susceptible of interpretation. The time for partition is the time when testatrix's four children agree that "it is more profitable" to divide the estate. Until that time, testatrix's "estate is to be kept intact," and (under Codicil-One) the income is to be paid to six persons. The estate will not be *kept intact* if a part is sold, and if no part is to be sold, it will be *more profitable* to divide it when the value looked up in the estate properties ceases to make an adequate return in income. This, then, is the meaning to be attributed to the words "more profitable"; and this meaning expresses a standard which can be objectively applied by a court. As appears from the inventory referred to in our preliminary statement, at least 84% of testatrix's estate was apparently well invested at the time of her death, and this affords some explanation of testatrix's willingness to deprive her children of the power of sale until the time we have indicated. It must be implied from the language under discussion that partition may be made when one of the four surviving children of testatrix dies, or becomes otherwise incapable of exercising the discretion vested in said children under this provision of the will. The power of determining when the estate was to be divided was entrusted to the judgment of all four children, not to less than four; unanimous agreement, of four designated persons was required. Testatrix thus manifested an intention that the power not survive.

▪ (4) Plaintiffs say that under our construction no partition will ever be made because any one of testatrix's children could arbitrarily refuse to agree to a partition,

and it will always be to the interest of Defendants Ethel Mouton and Ada Reinhard to refuse a partition because their children will cease to receive any income when a partition is made.

This argument is denied. Testatrix has left to the discretion of her four children the determination of when it would be more profitable to partition her estate; but this discretion would not be exercised unless each child formed a reasoned judgment, in good faith and upon reasonable grounds, as to whether it would be, or would not be, in fact, more profitable to divide the estate than to operate it as a unit. Their rule of guidance has been stated; it will be more profitable to divide the estate when the values locked up in the estate properties cease to return 'the income which such values ought to produce. It would be a departure from this standard, and a positive abuse of discretion, if a child refused arbitrarily to partition the estate or declined to agree to a partition because that would terminate the income received by a grandchild.

The courts commonly review and revise the exercise of such a discretionary power where an objective standard has been provided them by the testator, as testatrix did here. We cannot interpret the final sentence of Will-Fourth as settling an absolute and unrevisable power upon each of testatrix's children; instead, as we have pointed out above, this provision was intended to benefit and to protect all of testatrix's beneficiaries and it constituted an integral part of the trust she created. It affects all of the beneficiaries and the court may act to see that it is not misused.

The following authorities support our conclusion: In Grant v. Stephens, Tex.Civ. App., 200 S.W. 893, at page 896, the court said (citing Pray. v. Belt, 1 Pet. 670, 7 L. Ed. 309): "In the instant case the chosen umpires have construed the will so as to include within the estate devised and bequeathed to them in trust the income as well as the corpus of the estate. Since we do not feel justified in holding that the conclusion reached by the executors and trustees upon this point was not fairly and honestly made, and reasonably to be predicated upon the terms of the will taken as a whole,

it follows that we are not authorized, under the authorities, to overrule their decision. Of course, if the decision made by the trustees evidenced a gross departure from the manifest intent of the testator as disclosed in the will, then it could not be said that such decision was the result of an honest endeavor to find that intent, as held in Pray v. Belt, 1 Pet. (U.S.) 670, 7 L.Ed. 309. But we do not find such a condition to exist here, and are of the opinion that such conclusion reached by the trustees, upon a question involving the proper construction of the terms used by the testator, is one reasonably reached and deduced from the language used." (The discretion vested in the trustees was one of construing the will). Essentially the same rule was expressed in more forcible language by the Supreme Judicial Court of Massachusetts in Corkery v. Dorsey, 223 Mass. 97, 111 N.E. 795, at page 796, as follows: "The trustee doubtless exercised his honest judgment in good faith in reaching the conclusion in his own mind that Miss Fay was 'deserving and in need of aid.' That fact, however, is not decisive. The power conferred upon the trustee was the exercise of reasonably sound judgment. No arbitrary or capricious power was conferred even though honestly exercised. A trustee vested with discretionary power to distribute a fund in whole or in part is bound to use reasonable prudence. The possession of full power or wide discretion by a trustee means the kind of power and discretion which inheres in a fiduciary relation and not that illimitable potentiality which an unrestrained individual possesses respecting his own property. There is an implication, when even broad powers are conferred, that they are to be exercised with that soundness of judgment which follows from a due appreciation of trust responsibility. Prudence and reasonableness, not caprice or careless good nature, much less a desire on the part of the trustee to be relieved from trouble or from the possibility of making a foolish investment, furnish the standard of conduct. * * * Doubtless a trust might be created which by its terms would make the judgment of the trustee, however unwise it might be, the final test. * * * But the present instrument does not confer an uncontrolled and absolute discretion." In Re Naglee's Estate (Catherwood's Appeal), 52 Pa. 154, the Supreme Court of Pennsylvania refused to revise the conclusion made by trustees under a provision similar to, though broader than, the final sentence of Will-Fourth, but said: "We do not say that if the trustees acted capriciously, and in wanton disregard of the interests of the estate and of the children of the testator, if in other words, they did not exercise their discretion, but acted wholly without reason, a court of equity should not interfere. But this is no such case. The appellants have been unable to show anything that leads us to doubt the honest and judicious exercise of the discretion vested in the trustees by the will. We have, therefore, no right to substitute the opinions of witnesses, if there were any such, or even our opinion for the opinion of those to whom the testator exclusively confided the determination of the question." And in Re Brown, 345 Pa. 373, 29 A.2d 52, 55, the Supreme Court of Pennsylvania reiterated this rule as follows: "While a court cannot control the discretion conferred upon a trustee it may compel him to exercise it in good faith and within the bounds of a reasonable judgment, and it may also interpose where he fails to use his judgment at all because of a mistaken view, either of fact or law, as to the extent of his powers or duties." Finally, see Colton v. Colton, 127 U.S. 300, 8 S.Ct. 1164, 32 L.Ed. 138.

■■■ (4) A partition as of right is denied. The evidence referred to below, in our discussion of Point 7, indicates that the time for partition may have arrived, but the question involved is one of fact and cannot be determined on these appeals.

These comments dispose of all questions of construction raised on these appeals, and we shall now refer specifically to some Points of Error assigned by Plaintiffs.

■■■ Under their Points 5 and 6, Plaintiffs say that the trial court erred in holding that testatrix's will was unambiguous and in excluding certain evidence tendered by them to explain various parts of the will. Points 5 and 6 are overruled. The will is

susceptible of construction, with the aid of such evidence as the trial court did admit; and the matters excluded would not change our conclusions. Some of the excluded testimony flatly contradicts various provisions of the testatrix's will.

■ Under their Point 7, Plaintiffs say that the trial court erred in excluding evidence tending to show that market values of some of the real property belonging to the estate had greatly increased. They say that this evidence tended to show that it would be "more profitable" to make a partition of the estate. Point 7 is overruled. The trial court ordered a partition of the estate, and under the trial court's judgment any error in excluding this evidence (and it bore on no other issue than partition of the estate) was harmless to Plaintiffs, who desired the estate to be partitioned. True, this evidence is of material significance under our construction of the will, for while we cannot say that the estate is to be partitioned now, this evidence does indicate that the time for a partition has come. It tends to prove that the values locked up in the properties of the estate have ceased to make due return in income. Nevertheless, all issues of accounting and of partitioning were dismissed in the trial court, and since the partition directed by the trial court was merely an incident of, and actually a part of, his construction of the will, we cannot remand the cause. This excluded evidence now bears on the question of whether the testatrix's children have abused their discretion in refusing to divide the estate, and that type of issue went out of the case with the dismissal referred to; we have jurisdiction only to construe the will.

The judgment of the trial court construing the will of Mrs. Mattie F. Cruse is therefore in part set aside and in part affirmed, and to this end judgment is now rendered construing Mrs. Cruse's will as follows: (A) Codicil-Two is precatory. (B) Codicil-Three vests Defendant Ethel Mouton with a right of occupancy of testatrix's home having the extent and incidents referred to above. (C) Codicil-Four operates after the death of testatrix as well as before and creates a limitation upon the devises and bequests made to testatrix's four children, as hereinbefore described. (D)

Under Codicil-One and Will-Fourth a trust is created for the benefit of testatrix's four children and her two grandchildren to endure as stated and to have the incidents hereinbefore set out. (E) Partition of testatrix's estate as a matter of right is denied. (F) For other rulings reference is made to the opinion.

COE, C. J., is disqualified and not sitting.