SUE-ELLEN HERSHMAN-TCHEREPNIN *vs.* NICHOLAS
TCHEREPNIN & others.[1]

Middlesex. April 9, 2008. - July 31, 2008.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & CORDY, JJ.

*Will,* Construction. *Tenants in Common. Real Property,* Life estate, Tenancy in
common, Partition. *Probate Court,* Partition proceedings.

In a dispute over a devise of certain real property in a will, this court concluded
that the testator devised to his wife (the petitioner) and to each of his four
children by an earlier marriage a one-fifth present possessory interest in
the property as tenants in common [84-90], and also granted the wife a
right against partition (i.e., a restraint on the children's ability to partition
the property for as long as the wife chose to remain there) [90-93], which,
in the unique circumstances of this case, was terminated by the wife's fil-
ing of a petition for partition [93-95].

PETITION for partition and sale of real estate filed in the Middle-
sex Division of the Probate and Family Court Department on
June 4, 2004.

The case was heard by *Dorothy M. Gibson,* J., on motions for
summary judgment, and entry of separate and final judgment was
ordered by her.

After review by the Appeals Court, the Supreme Judicial Court
granted leave to obtain further appellate review.

*John C. LaLiberte (Anthony L. DeProspo, Jr.,* with him) for
the plaintiff.

*Diane C. Tillotson* for the defendants.

MARSHALL, C.J. This case is before this court on an applica-
tion for further appellate review of a judgment by the Probate
and Family Court declaring that Ivan Tcherepnin (testator),
through his will, devised his home as follows: a life estate to
his wife, Sue-Ellen Hershman-Tcherepnin (wife), and a one-
fifth future interest in remainder to her and each of his four

---

[1]Stefan Tcherepnin, Sergei Tcherepnin, and Sarina Tcherepnin-Morris.

children by an earlier marriage. The Appeals Court reversed that judgment, concluding that the will did not give the wife a life estate. See *Hershman-Tcherepnin* v. *Tcherepnin*, 70 Mass. App. Ct. 218 (2007). We conclude that the testator devised to the wife and each child a one-fifth present possessory interest in the home as tenants in common, and granted the wife a right against partition. We also conclude that, in the particular circumstances of this case, the wife's filing of a petition for partition terminated her protection against partition.

1. *Procedural background.* In June, 2004, after the will was probated, the wife filed a petition for partition in the Probate and Family Court. She claimed that the will granted her "a right to occupy [the house] for life . . . which [she] wishes to hold separately" — i.e., a life estate — and that the will also granted her and each of her four stepchildren a future, one-fifth remainder interest in the house. The wife requested that, if the property could not be partitioned in kind "without great inconvenience," that it be "set off" to her for an amount "as the commissioners award to make the partition just and equal."[2] Alternatively, she requested that the property be sold at a private sale for not less than $670,000, and that the proceeds be divided among her and the children.[3] See generally G. L. c. 241, § 6 (specifying form of partition).

In March, 2005, the four children filed a response to the

---

[2]General Laws c. 241, § 14, provides: "If a part of the land cannot be divided without great inconvenience to the owners, or is of greater value than the share of any party, or if all the land cannot be divided without such inconvenience, the whole or any part thereof may be set off to any one or more of the parties, with his or their consent, upon payment by him or them to any one or more of the others of such amounts of money as the commissioners award to make the partition just and equal." See *King* v. *Reed*, 11 Gray 490, 491-492 (1858) (to whom property should be set off depends on circumstances of parties — divestment of estate may be more injurious to one cotenant than another; one may be willing to pay more than appraised value).

[3]General Laws c. 241, § 31, provides, in pertinent part: "In partition proceedings the court may order the commissioners to sell and convey the whole or any part of the land which cannot be divided advantageously, upon such terms and conditions and with such securities for the proceeds of the sale as the court may order, and to distribute the proceeds so as to make the partition just and equal . . . . [T]he sale may be a private sale, upon the terms as the court orders, if it finds after notice, as provided in section 8, and a hearing, or after receiving the written assent of all parties in interest, that the interests of all parties will be promoted thereby. . . ."

wife's petition and counterclaimed for a declaratory judgment.[4] They argued that the will granted the wife and each child a one-fifth present possessory interest in the house — i.e., concurrent interests as tenants in common. The children further claimed that the testator's grant to the wife of the "right to remain [in the house] for as long as she desires" confers not a life estate but only "a mere right of occupancy and a defense to ouster and partition."

The parties filed cross motions for summary judgment. In September, 2005, a judge in the Probate and Family Court allowed the wife's motion, concluding that the will is unambiguous and that it devised to the wife a life estate, as well as a one-fifth remainder interest. She concluded that the four children were each given a one-fifth remainder interest and no present possessory interest. The judge further concluded that the wife's petition for partition did not "amount to a relinquishment of her interest in the . . . property," i.e., that the wife was "within her rights, as a life tenant, to seek partition of the property without relinquishing her interest."

Thereafter, in January, 2006, the wife moved for the appointment of a commissioner and for an order to sell the real estate by private sale. The judge denied the motion without prejudice, noting that a partition by sale was premature as none of the parties had yet presented evidence showing the need for a partition, or evidence that a physical partition would be inconvenient or nonadvantageous, making a private sale necessary.[5] The judge noted that the focus of the litigation up to that point had been the interpretation of the will, and that in allowing the wife's motion

[4]The children argued that, until the court determined the interests devised under the will, partition of the property would be premature. "The interpretation and construction of a will . . . [is most commonly] sought in a complaint for instructions, a complaint for declaratory relief, or an action for instructions and declaratory relief." S.M. Dunphy, Probate Law and Practice § 30.2, at 573 (2d ed. 1997) (Dunphy).

[5]See *Delta Materials Corp.* v. *Bagdon*, 33 Mass. App. Ct. 333, 338 (1992), quoting *Heald* v. *Kennard*, 180 Mass. 521, 522 (1902) (neither party has burden of proof on whether property can be advantageously divided; court must find by preponderance of evidence that it cannot do so before ordering a sale; "[a] sale is not simply an equally available alternative to a physical division; it may be ordered only after the court determines, upon careful findings, that advantageous division cannot be made"; "the advantage or disadvantage generally must be pecuniary").

for summary judgment the judge had resolved only the matter of the respective interests of the parties in the property and had concluded that the wife could proceed to *seek* a partition of the property.

In June, 2006, the judge entered separate and final judgment on the children's counterclaim for a declaratory judgment, pursuant to Mass. R. Civ. P. 54 (b), 365 Mass. 820 (1974). Consistent with her allowance of the wife's motion for summary judgment, the judge declared that the will unambiguously granted the wife a life estate and a one-fifth remainder interest in the property, "subject to [p]artition pursuant to the provisions of [G. L. c.] 241." The judge "specifically reserve[d] for later adjudication those aspects of the [petition for partition] relating to the value of the assigned interests in the [p]roperty." Thereafter, the children filed a timely notice of appeal.[6]

2. *Factual background.*[7] a. *The will.* The testator's will provides, in pertinent part, as follows:

> "FOURTH: If I do not leave property in this will to one or more of the children or grandchildren whom I have identified above [he identified his four children but no grandchildren], my failure to do so is intentional."

Under the heading "SPECIFIC BEQUESTS OF PROPERTY," the will states, in pertinent part:

---

[6]On March 2, 2007, while the children's appeal was pending in the Appeals Court, the judge conducted a trial on the value of the property. In a judgment dated May 21, 2007, the judge found that, as of the date of trial, the fair market value of the property was $790,500; the value of the wife's life estate was $613,169.86; and the value of the one-fifth remainder interests (the wife's and the children's combined) was $177,330.14. When the case was argued in the Appeals Court on June 8, 2007, counsel for the wife informed the court about the valuation trial and judgment, and the court invited counsel to submit a copy of the judgment; counsel did so without objection. We do not rely on that valuation judgment in deciding the matter before us. However, because we conclude that the wife does not own a life estate, the value of the parties' respective interests will have to be recalculated on remand.

[7]The summary judgment record consists, in pertinent part, of the following: the pleadings (the wife's petition for partition; the children's response and counterclaim for a declaratory judgment; and the parties' cross motions for summary judgment); a joint pretrial memorandum including stipulations of uncontested facts; the testator's will; affidavits from the wife, the testator's brother, Peter (the executor), and each of the children; the wife's answers to interrogatories; and deeds concerning the house.

"SIXTH: *I give one fifth (¹/₅) ownership of the property at 96 Russell Avenue, Watertown, Ma., the right to remain there for as long as she desires, and her choice of furnishings* and bric-a-bracs in my house and office, my Macintosh IIci, monitor and TI laserprinter, fifty thousand ($50,000) dollars in cash or stocks, my 1987 SAAB automobile and the print 'Boy and Bug' by Margo Hoff *to Sue Ellen* Hershman-Tcherepnin. . . .[8]

"TENTH: *I give one fifth (¹/₅) of the property at 96 Russell Ave., Watertown and its furnishings,* and all photos and documents pertaining to my mother, *to Sarina* Tcherepnin. . . .

"ELEVENTH: *I give one fifth (¹/₅) of the property at 96 Russell Ave., Watertown and its furnishings,* the Macintosh 5300 powerbook and accessories and the Sharp videocamcorder and tripod *to Nicholas* Tcherepnin. . . .

"TWELFTH: *I give one fifth (¹/₅) of the property at 96 Russell Ave., Watertown and its furnishings,* Macintosh 660AV and accessories, psalteries and santur, electronic music instruments, including Serge Modular stuff, and the Steinway grand piano *to Stefan* Tcherepnin. . . .

"THIRTEENTH: *I give one fifth (¹/₅) of the property at 96 Russell Ave., Watertown, one fifth (¹/₅) of all furnishings,* all photographic equipment and the Sony Hi-8 videocam and accessories *to Serge*[9] Tcherepnin, my son . . . ." (Emphases added.)

Under the heading "RESIDUARY ESTATE," the will provides:

"FOURTEENTH: I give my residuary estate to my children, Sarina, Nicholas, Stefan and Serge Tcherepnin and my wife, Sue Ellen Hershman-Tcherepnin. . . ."

---

[8]In articles seven through nine, the testator bequeathed certain personal property and money to his former wife, Anne, and other personal property to his brothers.

[9]In the will, the testator spelled his youngest son's name "Serge," but the son, in his affidavit, spelled his name "Sergei."

And under the heading "DIVISION OF BEQUESTS," the will provides:

> "SEVENTEENTH: Any specific bequest or residuary bequest made in this will to two or more beneficiaries shall be shared equally among them, unless unequal shares are specifically indicated."

b. *Circumstances of the making of the will.* The house came into the Tcherepnin family in 1981, when it was acquired by the parents of the testator's former wife, Anne, the mother of the testator's four children: Sarina, Nicholas, Stefan, and Sergei. In 1983, the property was transferred from Anne's parents to Anne and the testator. Seven years later, in 1990, the testator and Anne divorced. In 1994, Anne transferred title solely to the testator.

All of the children lived in the house through the 1980's, and two of them (Stefan and Sergei) lived there longer. Sergei lived in the house until 1993, when, at approximately age twelve, he moved to Falmouth to live with his mother. He kept his bedroom in the Watertown house, however, and visited nearly every weekend. Stefan also lived in the house until 1993, when, at approximately age fifteen, he apparently moved out. Later, at age sixteen or seventeen, Stefan returned to live in the testator's house for approximately five more years: from "approximately 1994 to 1999" (according to Stefan), or from July, 1995, to "some time in 2000" (according to the wife).[10] Stefan's girl friend also lived in the house, from "approximately 1997 to 1998," according to Stefan, or "[s]ome time in the [f]all of 1997 to the [s]pring of 1998," according to the wife.

The wife, a musician (like the testator), met the testator at various concerts in the early 1980's. She moved into the house in 1995, and occupied Sarina's bedroom.[11] The same year, the

---

[10]When Stefan returned to the house, the testator required Stefan to sign a contract that the testator and the wife had devised, mandating that Stefan find employment, perform household chores, and observe appropriate standards of behavior. If Stefan failed to meet those criteria, he would be required to move out. In addition, according to the wife, the testator "insisted that Stefan not have a key to the house." Stefan apparently abided by the contract (he was not forced to move out), and he eventually moved out on his own in 1999 or 2000, to attend college in Ohio. There is no evidence that he later sought to return to the house to live.

[11]At the time, the wife was approximately forty-one years old. In March,

testator became ill and his illness progressed over the next few years. In late December, 1997, approximately three and one-half months before he died, the testator married the wife. Following the marriage, the testator encouraged his children to welcome the wife into the family, which they did.

The testator executed his will on March 13, 1998, approximately one month before he died on April 11, 1998. He drafted the will himself using a computer software program (the record is devoid of any information about the will-drafting software).[12] Although the wife claimed, in her answers to interrogatories, that it was her "understanding" that the testator met privately with Attorney Robert DiLibero "to discuss execution of his will," the wife also asserted that she did not "know" whether the testator "consulted anyone regarding the drafting of his will," and that she did not herself assist him.[13]

At the time the testator executed the will (and at the time of his death), the children's ages were as follows: Sarina, twenty-nine; Nicholas, twenty-seven; Stefan, twenty; and Sergei, sixteen. Stefan was living in the house (apparently with his girl friend), and Sergei, while living with his mother in Falmouth, visited the house nearly every weekend. In fact, all three sons, including Nicholas, "maintained" their own bedrooms in the house. According to the sons, "everyone" — including the testator — considered the property the " 'family' home." None of the children currently lives in the house.[14]

---

2007, at the time of the valuation trial, she was fifty-three years old.

[12]According to the wife, while the testator was working on the will he asked her "if she wanted to remain living" in the house after his death, and she said, "yes." As discussed below, statements by a testator about his intent in his will are not admissible in construing the will. See note 16, *infra*. Nothing meaningful is lost by the exclusion of the testator's statement, however, because the language of the will itself says the same thing that the testator told the wife orally — i.e., that she had "the right to remain [in the house] for as long as she desires."

[13]In the summary judgment record, there is no affidavit from the attorney, nor did the parties in their pretrial memorandum list the attorney as a potential witness. No party has made any suggestion that the attorney would add anything helpful to discerning the testator's intent.

[14]Shortly after the testator died, the wife asked Sarina and her husband whether they wished to move into the house with her, but they declined. Although the will did not require her to do so, in 2000, the wife began assuming the costs of the mortgage, taxes, maintenance, repairs, and homeowner's insurance. From 1998 to 2000, the mortgage and taxes had been paid by the

3. *Discussion.* The fundamental rule for the construction of wills "is to ascertain the intention of the testator from the whole instrument, attributing due weight to all its language, considered in the light of the circumstances known to him at the time of its execution and to give effect to that intent unless some positive rule of law forbids." *Fitts* v. *Powell,* 307 Mass. 449, 454 (1940). Accord *Flannery* v. *McNamara,* 432 Mass. 665, 667-668 (2000); *Putnam* v. *Putnam,* 366 Mass. 261, 266 (1974); *Tucci* v. *Di-Gregorio,* 358 Mass. 493, 495-496 (1970); *Ware* v. *Minot,* 202 Mass. 512, 516 (1909). "All the language in the will is to be given effect, if at all possible. The court will look to the testator's general plan in the will and interpret the will so as to harmonize its provisions if that is possible." S.M. Dunphy, Probate Law and Practice § 30.2, at 575 (2d ed. 1997) (Dunphy).

Although the interpretation of a will begins with the four corners of the instrument, see G. L. c. 191, § 1A (2) ("intention of a testator expressed in his will shall control the legal effect of his dispositions"), it does not necessarily end there. See 2 T.H. Belknap, Newhall's Settlement of Estates and Fiduciary Law in Massachusetts § 33:30, at 381; § 33:33, at 388 (5th ed. 1997) ("The principal rule is that the primary purpose of construction is to ascertain the intention of the testator, and that this intention is to be gleaned from the four corners of the instrument. All other rules are supplementary to this. . . . A will is construed in the light of the surrounding circumstances as they existed at the time of its execution. Consequently evidence is always admissible to show the surrounding facts so far as they are relevant, such as the nature and size of the testator's estate, his family and relatives and his relations toward them, etc."); Dunphy, *supra* at § 30.12, at 596-597 (same).[15]

estate. In 2002, the wife made the house inaccessible to the children and has not paid them rent; since then, the children have not contributed to the mortgage. In December, 1999, an individual moved into the house and has remained there. The record does not explain his relationship to the wife or the children. For periods of time between 2000 and 2003, one of the wife's cousins lived in the house.

[15] "The court first attempts to ascertain the testator's intention by interpreting the language used by him, by studying the will as a whole, giving weight to the ordinary meaning of the words used, the context in which they appear, and considering other relevant evidence, including the circumstances in which the will was drafted. If the testator's intention cannot be ascertained by such interpretation the court will then resort to the rules of construction." Dunphy,

"In all cases, evidence of surrounding facts and circumstances known to the testator may be received into evidence for the purpose of placing the court in a setting as near as possible to that occupied by the testator at the time the will was written so that it can more clearly ascertain the testator's intention as expressed in the provisions of the will. But when the will contains a latent [ambiguity, i.e., one that becomes apparent only when the court attempts to apply seemingly clear terms of the will to people or things] or [a] patent ambiguity [i.e., inconsistencies created by obvious conflicts in the language of the will] which cannot be resolved by recourse to evidence of circumstances existing at the time the will was executed, the court has approved the admission of additional extrinsic evidence of facts known to the testator and in light of which he viewed the ambiguous language."

Smith, The Admissibility of Extrinsic Evidence in Will Interpretation Cases, 64 Mass. L. Rev. 123, 124, 128 (1979). Accord *Clymer* v. *Mayo*, 393 Mass. 754, 770 (1985); Dunphy, *supra* at § 30.12, at 596-597.[16] Not all ambiguities can be defined neatly as patent or latent. See 15 R. Powell, Real Property § 85.19[1], at 85-338 (M. Wolf ed. 2007) ("Ambiguity exists where a word, phrase or provision of a will is susceptible to two or more reasonable interpretations or meanings"); Dunphy, *supra* at § 30.2, at 575 (will is unambiguous "[w]here no doubt

---

*supra* at § 30.2, at 576-577. Some rules of construction arise by statute, see G. L. c. 191, § 1A (those are not implicated in this case), while others are based in the common law. See 80 Am. Jur. 2d Wills §§ 1003-1007 (2002) (presume testator acted rationally; construe will practically; avoid absurdity; seek to uphold validity or effectiveness of will; harmonize repugnant, conflicting, inconsistent provisions; give effect to all parts of will; follow ejusdem generis rule).

[16]When a will is ambiguous, extrinsic evidence regarding the testator's state of feelings toward and relations to the claimants (including the testator's own statements in those regards) is admissible. See *Boston Safe Deposit & Trust Co.* v. *Prindle*, 290 Mass. 577, 582 (1935). What may not be admitted is direct expressions of intention made by the testator, or other extrinsic evidence used to create an ambiguity or to alter rather than explain the language of a will. See Smith, The Admissibility of Extrinsic Evidence in Will Interpretation Cases, 64 Mass. L. Rev. 123, 125-128 (1979); *Boston Safe Deposit & Trust Co.* v. *Prindle, supra.* See also *Flannery* v. *McNamara*, 432 Mass. 665, 669-673 (2000); *Calder* v. *Bryant*, 282 Mass. 231, 239 (1933); 2 T.H. Belknap, Newhall's Settlement of Estates and Fiduciary Law in Massachusetts § 33:33, at 388 (5th ed. 1997).

exists as to the property bequeathed or the identity of the beneficiary . . .").[17]

a. *The testator's will is ambiguous.* Although it is clear that the testator granted the wife and each of his four children a one-fifth ownership interest in the house,[18] it is not clear whether those interests are present estates or future (remainder) estates, in light of the additional grant to the wife of the "right to remain there for as long as she desires." That language creates an ambiguity because it is susceptible to two meanings: a life estate or a mere right of occupancy (a right or privilege not to be removed from the house). Put another way, the phrase leaves some doubt about the property bequeathed, i.e., the quantum of the estate

[17]The following cases illustrate the difference between clear and ambiguous provisions in a will. Compare *Gustafson* v. *Svenson,* 373 Mass. 273, 275 (1977) (no ambiguity in phrase "his heirs per stirpes" where "heirs," by force of statute, included surviving spouse; extrinsic evidence of statements made by testatrices to attorney that they wished residuary estate to pass to brother but not his wife inadmissible); *Watson* v. *Goldthwaite,* 345 Mass. 29, 33 (1962) (no ambiguity in word "issue," which has technical legal meaning referring to all lineal descendants; extrinsic evidence of testimony pertaining to testatrix's written instructions inadmissible); *McMillen* v. *McMillen,* 57 Mass. App. Ct. 568, 569-576 (2003) (no ambiguity in meaning of "paintings, furniture and furnishings" in will where court looked to dictionary definitions and precedent from other jurisdictions to determine meaning of those terms), with *Putnam* v. *Putnam,* 366 Mass. 261, 269-271 (1974) (where conflict in language of will created ambiguity regarding testator's intent with respect to estate tax marital deduction, extrinsic evidence concerning statements of testator's attorney, will of testator's wife, and size of testator's estate relative to his wife's were admissible); *Cronan* v. *Cronan,* 286 Mass. 497, 498-502 (1934) (where will directed that property was not to be sold for ten years, that executors could do so after ten years if "to a good advantage," and that all property was to be divided at end of ten years, ambiguity whether property had to be sold or divided after exactly ten years or whether property could be sold thereafter and the proceeds divided; extrinsic conditions of real estate market relevant); *Sullivan* v. *Sullivan,* 26 Mass. App. Ct. 502 (1988) (whether will that devised property to certain individuals devised property only to those individuals or to class was ambiguous; extrinsic evidence of testator's feelings toward claimants admissible).

[18]The difference between the bequest to the wife ("I *give* one-fifth [¹/₅] *ownership* of the property") and the bequests to each child ("I *give* one-fifth [¹/₅] of the property") is of no consequence (emphases added). "[A] conveyance 'to B' will give B an estate in fee simple absolute." H.J. Alperin & L.D. Shubow, Summary of Basic Law § 17.12, at 579 (3d ed. 1996) (Alperin & Shubow). See G. L. c. 183, § 13 ("A deed or reservation of real estate shall be construed to convey or reserve an estate in fee simple, unless a different intention clearly appears in the deed").

given to the wife. We may resolve the ambiguity on the summary judgment record before us as a matter of law; no party raises a genuine dispute of material fact about the extrinsic facts surrounding the making of the will that would warrant a trial. See Massachusetts Jurisprudence, Decedents' Estates and Trusts § 5:51, at 157-158 (1994).[19]

b. *The will created a tenancy in common with protection for the wife against removal.* Although no authority in Massachusetts or elsewhere resolves this case, analogous cases and general principles governing the creation of estates in real property guide our determination of the nature of the interests created here. We conclude, as did the Appeals Court, that the will devised five concurrent present ownership interests to the wife and children — i.e., that it created a tenancy in common. *Hershman-Tcherepnin* v. *Tcherepnin*, 70 Mass. App. Ct. 218, 219 (2007). We also conclude, however, that the wife was given something more than the children by the will's inclusion of the "right to remain" language: not an additional estate in the property, but special protection against being removed from the home by partition, as the children concede. Finally, we conclude that, in the particular circumstances of the testator's wishes, the wife terminated her protection against partition by pursuing a petition for partition. We begin by examining whether the will conveys to the wife a life estate and five remainder interests. We conclude that it does not.

Typically, "a conveyance 'to B during his life' or 'to B until

[19]Compare *Clymer* v. *Mayo*, 393 Mass. 754, 770 (1985) (resolving ambiguity regarding identity of donees based on agreed statement of uncontested facts); *Putnam* v. *Putnam*, *supra* at 266-271 (on report from Probate and Family Court on statement of agreed facts, ambiguous provision in will regarding marital tax deduction resolved by reference to extrinsic evidence); *Tucci* v. *DiGregorio*, 358 Mass. 493, 493-494 (1970) (where petition for declaration of rights of two sisters regarding whether testator devised two-family home and garages to one or both sisters was submitted on agreed statement of facts, court "decide[d] the questions of law involved unaffected by the [trial judge's] decision"), with *McKelvy* v. *Terry*, 370 Mass. 328, 334-335 (1976) (where will ambiguous regarding exercise of power of appointment, trial held to resolve factual dispute concerning extrinsic evidence regarding actions of testator and attorney who drafted will); *McMillen* v. *McMillen*, 57 Mass. App. Ct. 568, 569-576 (2003) (on complaint for instructions regarding meaning of "paintings, furniture and furnishings" in will, trial held to resolve factual disputes about circumstances of will's creation, including how testator regarded his personal property).

his death' or other similar words of limitation will create a life estate in B." H.J. Alperin & L.D. Shubow, Summary of Basic Law § 17.15, at 584 (3d ed. 1996) (Alperin & Shubow).[20] See cases cited in *Hershman-Tcherepnin* v. *Tcherepnin*, *supra* at 222-223. Here, the testator used neither "life" nor "death," nor did he use comparable wording. Contrast *Bernat* v. *Kivior*, 22 Mass. App. Ct. 957, 958 (1986) (conveyance of property to four sisters "subject to . . . rights [of fifth sister] to occupy the granted premises for the rest of her life" gave life estate to fifth sister and future interests in remainder to other sisters).

Where a will does not employ the language typically used to create a life estate, the will may nonetheless create a life estate if other factors are present, such as where the will grants the premises to the person in question or requires that person to maintain the property and pay taxes and insurance on it. See Annot., Quantum or Character of Estate or Interest Created by Language Providing Premises as a Home, or Giving or Granting Same for Such Use, 45 A.L.R.2d 699, 707 (1956) ("In most instances in which the language of disposal does not include a use of the expression 'for life,' or a similar one, but gives or grants the premises 'for so long as' the conveyee shall occupy the same as a home, or in similar terms, the conclusion reached has been that a life estate was given"). See also cases cited in *Hershman-Tcherepnin* v. *Tcherepnin*, *supra* at 223-225.

In this case, however, the testator did not give or grant the premises — i.e., the entire house — to the wife for so long as she desired to live there; he gave her only one-fifth of the house and the right to remain there for as long as she desired. Nor did he require, through his will, that the wife maintain the property or pay taxes or insurance on it. That the wife voluntarily assumed those duties in 2000 does not change the fact that the will did not

---

[20]"The owner of a possessory life estate, i.e., the life tenant, has a right to the exclusive possession of the land." Alperin & Shubow, *supra* at § 17.15, at 585. See *Tinkham* v. *Wind*, 319 Mass. 158, 160 (1946). And if a remainder interest has been created, "during the existence of the life estate the remainderman is not entitled to possession until the death of the life tenant." *Daley* v. *Daley*, 308 Mass. 293, 307 (1941). "A life estate is alienable by the life tenant, and he can accordingly convey his estate to a third person, or mortgage it, or lease it for a term of years." Alperin & Shubow, *supra* at § 17.15, at 586.

require her to do so, and it is the testator's intent as reflected in the will that controls. Compare *Wilmarth* v. *Bridges*, 113 Mass. 407, 408, 410 (1873) (daughter received life estate where testator gave her "the use and improvement of all my real estate . . . so long as she chooses personally to occupy and improve the same; on condition of her keeping the building in repair and paying the taxes and costs of insurance"), with *Hesseltine* v. *Partridge*, 236 Mass. 77, 79, 81 (1920) (where will granted widow "the use and occupation" of house "so long as she shall desire to reside therein," but devised ownership of house to testator's daughters, widow did not receive life estate; daughter's ownership of house was "subject to the personal right of the widow to use and occupy it"; widow's "privilege of the use of this property as a residence was an interest in real estate of an unascertained, and probably indeterminate, value"). The indicia of a life estate that might make up for the absence of the use of traditional language to create such an estate are missing here.

Another reason that we conclude that the will did not create a life estate and five remainder interests is the absence of remainder language. Ordinarily, a future estate is created by language such as: " 'to B for life, remainder to C and his heirs' — B has a present life estate, and C has a remainder in fee simple." Alperin & Shubow, *supra* at § 17.25, at 595. Another example is: "to B for life, then to C and his heirs." *Id.* at 596. See *Wilmarth* v. *Bridges, supra* at 408, 410-411 (remainder created where property devised to daughter for "so long as she chooses to" occupy it, and "whenever [she] shall cease [to do so], that the whole shall be divided among my children"). Here, no such comparable language was used.

Moreover, to read the will to grant the wife a life estate would be to give her a disproportionate share of the house — a one-fifth interest *plus* a life estate. The will and the circumstances under which it was created belie that reading and instead show that the testator intended to divide the house equally. The specific bequests in clauses six and ten through thirteen give the wife and each child a one-fifth interest in the house and its furnishings (with the wife getting first choice of the furnishings). And the seventeenth clause provides: "Any specific bequest or residuary bequest made in this will to two or more beneficiaries shall be shared

equally among them, unless unequal shares are specifically
indicated." The testator did not specify unequal shares in owner-
ship of the house — he did not give the wife a life estate *plus* a
one-fifth ownership interest; he gave her and each child only a
one-fifth ownership interest.

The wife began living in the home only in 1995 — relatively
late compared to the children, who had grown up in the house
in the 1980's. And even after the sons moved away, they con-
tinued to maintain their bedrooms in the house; "everyone,"
including the testator, considered the house the " 'family' home."
Moreover, at the time the will was created, Stefan was living in
the house, and Sergei was visiting nearly every weekend. When
the testator died, he had been married to the wife for a few months.
Those circumstances support the view that the testator intended
to give the wife not a disproportionate share of the house, but to
give her and each child equal shares of the property.

By giving the wife and the children equal, present shares in
the house, the testator created a tenancy in common. See G. L.
c. 184, § 7 ("A conveyance or devise of land to two or more
persons . . . shall create an estate in common"); *Hurley* v.
*A'Hearn*, 338 Mass. 695, 697 (1959) (devise of land and build-
ings to parties "share and share alike" created tenancy in com-
mon). Accord Alperin & Shubow, *supra* at § 17.43, at 610. As
such, each "has an equal right of entry, occupation and enjoy-
ment, the possession of one being presumed to be the posses-
sion of all." *Muskeget Island Club* v. *Prior*, 228 Mass. 95, 96
(1917).[21]

But the testator also gave the wife something above and beyond
what he gave the other cotenants: the "right to remain" in the
house "for as long as she desires." The testator was not an at-
torney, and so we consider the literal meaning of the words he
used. See *Hershman-Tcherepnin* v. *Tcherepnin*, 70 Mass. App. Ct.
218, 225-226 (2007), citing *Cruse* v. *Reinhard*, 208 S.W.2d 598,
601, 605 (Tex. Ct. App. 1948). The context in which the will was
made indicates that the testator's intention in providing the wife
with the "right to remain" was to ensure that the children could

---

[21]"The interest of a tenant in common is alienable, and may be transferred
without the consent of the co-tenants by deed, lease, mortgage, will, or intestate
succession." Alperin & Shubow, *supra* at § 17.43, at 610.

not force her out of the house. Although the children welcomed the wife into the family after she and the testator were married, she was relatively new to living in the house and was even newer as a member of the family. The children together were given a much greater share of the house than the wife (four-fifths versus one-fifth). Accordingly, even though a tenancy in common, by its very nature, protects each cotenant from exclusion or ouster, see Alperin & Shubow, *supra* at § 17.44, at 610-611, it is reasonable to conclude (in the absence of evidence indicating that the testator understood the legal rights created by a tenancy in common) that the testator used the "right to remain" language to ensure that the children understood that, despite her relatively short time in the house and in the family, and despite the fact that the children were given four-fifths of the house, the wife was entitled to stay in the house after the testator's death. See *Hershman-Tcherepnin v. Tcherepnin, supra* at 226-227. In other words, the "right to remain" language gave the wife not an estate in the property but a right or privilege not to be excluded from the home.[22] See *Cruse v. Reinhard, supra* at 605, 607 ("will and wish" that child "continue to live" in home "till and unless she wishes to change her residence" conferred nontransferable right of occupancy with no market value).

That the law of tenancies in common protects each cotenant from ouster is not to say, however, that the "right to remain" language is mere surplusage. We must give effect to that language, if possible. See Dunphy, *supra* at § 30.2, at 575; note 15, *supra*. We conclude that the "right to remain" language, while unnecessary to ensure the wife's protection from ouster, is meaningful as a means to accomplish the testator's intent to provide the wife with a home insofar as it protects her from losing her possessory interest through a partition (a point conceded by the children).

While a tenancy in common carries with it protection from

[22] "Whether an instrument which does not include language amounting to a direct gift or grant, but entitles one to the use of premises as a home so long as he remains thereon, or desires the same for such purpose, or sees fit so to use the premises, or which makes other comparable provision, operates to vest in the individual a life estate, or merely a personal right or privilege, is of course a matter of the construction of the particular instrument." Annot., Quantum or Character of Estate or Interest Created by Language Providing Premises as a Home, or Giving or Granting Same for Such Use, 45 A.L.R.2d 699, 715-716 (1956).

ouster, it also carries with it an absolute right to partition. See
G. L. c. 241, § 1 ("Any person . . . owning a present undivided
legal estate in land . . . shall be entitled to have partition in the
manner hereinafter provided"); Dunphy, *supra* at § 16.3, at 247
("Partition is either voluntary or compulsory . . . . Compulsory
partition is a partition by judicial proceedings at the insistence of
one or more of the co-tenants without regard to the wishes of the
other tenants. Partition is a matter of absolute right, it is not
dependent on the consent of any of the co-tenants or the discre-
tion of the court"); Alperin & Shubow, *supra* at § 17.44, at 612-
613. Pursuant to the absolute right to partition, each cotenant is
potentially vulnerable to being divested of his possessory interest
in the property if another cotenant seeks partition and a physical
division of the property is inconvenient or nonadvantageous.[23]
See notes 2 & 3, *supra.*

Thus, consistent with the testator's intent that the wife be pro-
tected against removal from the house by the children, we con-
clude — consistent with the children's concession — that he
intended that she be protected against partition. In other words,
we conclude that, in these circumstances, the testator's use of the
"right to remain" language is tantamount to a restraint on the
children's ability to partition the property for as long as the wife
chooses to remain there (i.e., no longer than her lifetime). See
Dunphy, *supra* at § 16.3, at 247 ("A testator could restrict parti-
tion by his devisees for a reasonable period of time"). See also

---

[23]Although the "preferred method of partition is the physical division of the
property among the co-tenants or 'division in kind,' " Alperin & Shubow, *su-
pra* at § 17.44, at 613, see also notes 2 & 3, *supra*, it is unclear whether the
house in this case can be physically partitioned (the house is a single-family,
two-story Victorian, according to a representation by the children's attorney at
oral argument). Whether the house here can be divided in kind has not yet
been litigated, as the Probate and Family Court judge noted when she denied
without prejudice the wife's motion for appointment of a commissioner and
for an order to sell the property at a private sale. See note 5, *supra*. We note,
however, that physical partition of a single-family house has often been
considered impossible. See, e.g., *DeRosa* v. *DeRosa*, 22 Conn. App. 114, 115
(1990) (single-family house and lot "obviously impossible physically to
divide"); *Fain* v. *Beaver*, 478 S.W.2d 816, 821 (Tex. Ct. App. 1972) ("house
and lot was manifestly incapable of partition in kind"); Craig-Taylor, Through
a Colored Looking Glass: A View of Judicial Partition, Family Land Loss, and
Rule Setting, 78 Wash. U. L.Q. 737, 756-758 (2000) (importance of preserv-
ing alienability of property principal reason courts typically order house sold
rather than actually divided).

10 R. Powell, Real Property § 77.08, at 77-35 to 77-37 (M. Wolf ed. 2007) (restraint on power to compel partition valid if for reasonable time, e.g., for lives in being; when instrument ambiguous as to presence or absence of attempted restraint, "courts have been liberal in inferring its presence"); 59A Am. Jur. 2d Partition §§ 54-55, at 47-48 (2003) (in considering restraint on partition, court "consider[s] the testator's apparent concerns, such as . . . that a purpose of the testator in postponing partition was to provide a home for a surviving spouse").[24] That is not to say, however, that the testator did not give the children the right to enter or live in the house. By creating a tenancy in common, he gave them such rights; but through the "right to remain" language he also prevented them from removing the wife from the house by partition.[25]

Although we conclude that the testator granted the wife protection from partition, in the particular circumstances of this case we conclude that the wife relinquished that protection by seeking partition. First, although she contended in her petition for partition that she held a life estate in the property and that

----

[24] In the fourth clause of the will, the testator stated that if he did not "leave property . . . to one or more of the children . . . [his] failure to do so [was] intentional." Our conclusion that the testator, through the "right to remain" language, gave the wife something more than he gave the children — a right against partition — is consistent with the intent in the fourth clause: although the "right to remain" is not an estate interest in the house, it is a right or privilege in the property that was left only to the wife.

[25] Some courts have held that a cotenant's right or privilege to occupy property may coexist with the rights of other cotenants to partition the property, but those cases have involved property that was already physically divided, not a single-family home. See *Hunt* v. *Meeker County Abstract & Loan Co.*, 128 Minn. 207, 208-209, 212-213 (1915) (two-story commercial building with physically divided offices could be partitioned despite cotenant's right of occupancy); *Cruse* v. *Reinhard*, 208 S.W.2d 598, 602-603, 607 (Tex. Ct. App. 1948) (right of occupancy in "home" consisting of various distinct living spaces "will not prevent a partition" of the estate, including the "home"; "the partition will be subject to [devisee's] right of occupancy," i.e., it "will be impressed with [her] right of occupancy if it is awarded, in whole or in part, to someone other than [herself]"; right "may still subsist after a sale has been made in the partition proceeding, and no reason occurs to us why a sale may not be made subject to such rights"). Cf. *Hesseltine* v. *Partridge*, 236 Mass. 77, 79, 81 (1920) (where will bequeathed house to daughters and granted privilege to widow to use property as residence, court noted bequest and grant "are not repugnant to each other, and both would have taken effect if the widow had not waived the provisions of the will").

she and each child held a one-fifth remainder interest, on that view she would not have held a concurrent possessory interest with the children and thus would not have been entitled to a partition at all. "Except for rare exceptions, future interests are not subject to a partition action brought by the sole owner of the entire possessory estate. Historically, partition serves to sever concurrent interests and is not to be used for an attempted severance of successive interests." 3 R. Powell, Real Property § 21.05[3][b], at 21-78 to 21-79 (2007). See 2 Tiffany, Real Property § 476, at 315-317 (3d ed. 1939 & Supp. 2008) ("one who has as life tenant the sole right of possession cannot usually maintain [a partition] proceeding as against the reversioners or remaindermen, even though he himself had an undivided interest in reversion or remainder, though as to the latter there is authority to the contrary, generally by reason of statute").[26]

The Massachusetts partition statute, G. L. c. 241, does not authorize the partition of future interests by a life tenant, and historically we have denied such partition. See G. L. c. 241, § 4 ("court may make partition . . . of the land included in the petition of which the parties thereto are co-tenants"); *Allen* v. *Libbey*, 140 Mass. 82, 83-84 (1885) (where widow held life estate in land as undivided one-half possessory interest shared with heirs, present possessory interests could be partitioned but not reversionary interests); *Judkins* v. *Judkins*, 109 Mass. 181, 182 (1872) (where life estates devised to petitioner and brother as tenants in common and remainder interests devised to heirs, partition "can extend only to the interest of which [the brothers]

---

[26]See, e.g., *Brown* v. *Brown*, 67 W. Va. 251, 253 (1910) (testator conveyed estate to wife for life with remainders to children and grandchildren; widow conveyed life estate to one of the children; that child was barred from compelling partition of remainder interests even though he held remainder interest himself; "[a] life tenant cannot have partition unless he waives his life estate, and thus gets it out of the way, destroys it, and lets the remaindermen at once come in. Had the plaintiff done this, he could as remainderman have sustained his case, but he did not do so"; "[t]he remaindermen could not ask partition pending the life estate . . . [t]he right ought to be mutual"); *Pabst Brewing Co.* v. *Melms*, 105 Wis. 441, 441-442 (1900) (owner of life estate in six-sevenths of property who also held one-seventh in fee could not partition property where others owned six-sevenths in remainder; "there is no joint possession to be divided. The plaintiff has the sole right of possession of the entire premises. There are no cotenants in possession, or entitled to possession, so long as the life estate remains in esse").

are seised [i.e., the life estates], and does not affect the rights of those who may have title to the remainder"); *Johnson* v. *Johnson*, 7 Allen 196, 196-198 (1863) (petitioner who held life estate with wife and acquired remainder interests in five-sixths of property could not partition property; "[a]s tenant for life he cannot ask it, because he is in lawful possession and has the pernancy of the rents and profits of the entire estate[, and] as grantee of the remainder in fee . . . he cannot have it, because . . . a petition for partition shall not be maintained by one who has only an estate in remainder or reversion"). Cf. *Bernat* v. *Kivior*, 22 Mass. App. Ct. 957, 959 (1986) ("The holder of a remainder interest only may not maintain partition proceedings"). Cf. also *Beech* v. *Beech*, 74 P.3d 1, 3-5 (Colo. 2003).

In any event, that the wife could have pursued a partition as an owner of a one-fifth interest in the property as a tenant in common with the children does not guarantee that the wife would have been able to obtain sole possession of the house by purchasing the children's shares, see note 2, *supra*, or that she would even have been able to remain in the house. See note 23, *supra*. In fact, unless the house can be partitioned in kind, which seems doubtful, it will have to be sold. See notes 2, 3, & 23, *supra*. That the wife anticipated the sale of the house is buttressed by the fact that she not only petitioned for partition, but she also moved for the appointment of a commissioner and an order directing that the property be sold. In sum, while not relinquishing her one-fifth ownership interest in the house, the wife, by seeking to partition the property, has demonstrated her willingness to give up her "right to remain" there "for so long as she desires." Cf. Alperin & Shubow, *supra* at § 17.13, at 580 (defeasible fee may be created by language indicating duration, e.g., "as long as"; "when the specified state of affairs ceases to exist or the specified event occurs, the estate expires by operation of law"). We thus conclude that, in the unique circumstances of this case, the wife has terminated her protection against partition.[27]

4. *Conclusion.* The testator's will devised to the wife and

---

[27]Even were the wife to make a declaration of a homestead estate under G. L. c. 188, §§ 1 and 2, that would not defeat the rights of the children, as tenants in common with the wife, to seek a partition of the property. See *Ladd* v. *Swanson*, 24 Mass. App. Ct. 644, 646 (1987).

each of the four children one-fifth ownership of the house as tenants in common. Through the "right to remain" language, the will also granted the wife protection against partition. In the particular circumstances of this case, however, the wife terminated that protection by seeking a partition. The judgment of the Probate and Family Court is reversed, and the case is remanded for further proceedings and a declaration of the parties' rights consistent with this opinion.

*So ordered.*